# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

October 13, 2020

Donald J. Wolfe, Jr., Esquire
Matthew E. Fischer, Esquire
Timothy R. Dudderar, Esquire
T. Brad Davey, Esquire
Jacqueline A. Rogers, Esquire
Potter Anderson & Corroon LP
1313 North Market Street
Wilmington, DE 19801

Paul D. Brown, Esquire
Joseph B. Cicero, Esquire
Chipman Brown Cicero & Cole, LLP
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Re: *In re: GR Burgr, LLC*
C.A. No. 12825-VCS

Dear Counsel:

After carefully considering the matter, I will adopt the Report and Proposed

Liquidation Plan for GR Burgr, LLC ("GRB"), as proposed by the Court-appointed

Receiver, Kurt M. Heyman, Esquire (the "Report").[1]

---

[1] D.I. 69. In doing so, I have considered the parties' exceptions to the Report (D.I. 86, 87, 100, 101), and the supplemental submissions from the Receiver (D.I. 117) and the parties (D.I. 119, 120). I note the parties appear to disagree on the appropriate standard of review. For his part, the Receiver observes that this court has reviewed custodian/receiver recommendations regarding the disposition of assets for abuse of discretion. Report at 44 (citing *In re TransPerfect Glob., Inc.*, 2018 WL 904160, at *16 (Del. Ch. Feb. 15, 2018)).

As the Receiver has observed, in the wake of the disintegration of the relationship between GRB's members, Gordon Ramsay through GR US Licensing, LP ("GRUS") and Rowen Seibel, GRB's remaining assets are:[2]

- The GRB Marks[3] and General GR Materials,[4] including "any modification, adaptation, improvement or derivative of or to the foregoing" and any "goodwill generated by such use" (together, the "IP Rights");

- The Company Rights,[5] including the Company Trademarks, the Concept, and the Recipes and Menus;

- All other rights which survived the termination of the Caesars Agreement, including Section 14.21 concerning any expansion plans for a "burger-themed" restaurant;

---

I need not decide the issue, however, because even under *de novo* review I am satisfied the Receiver's recommendations are wholly appropriate and should be adopted.

[2] Report at 26.

[3] The GRB Marks include the trademark "BURGR Gordon Ramsay," Recipes and Menus, the "Concept" of a "burger-centric/burger-themed restaurant," and other trade property developed by GRB to "identify the Restaurant." *See* Limited Liability Company Agreement of GR Burgr, LLC ("LLC Agmt."), at Fourth Recital; Development, Operation and License Agreement with Caesars Entertainment Corporation ("Caesars Agmt."), at 3.

[4] General GR Materials include "the concept, system menus and recipes designed for use in connection with the Restaurant . . . that are created by Gordon Ramsay. . . ." Caesars Agmt., at 3.

[5] As defined in the LLC Agmt., at Fourth Recital.

• The Counterclaims in the Delaware Action, except for Count III which is a direct claim asserted by Seibel against GRUS; and

• Seibel's derivative claims in the Nevada Actions.[6]

In his proposed Liquidation Plan, the Receiver recommends:

[T]hat the Court assign (a) all of GRB's claims against GRUS/Ramsay and/or Caesars to Seibel (to be pursued in Nevada at his own cost and limiting his award to 50% of any recovery); (b) all of GRB's claims against Seibel to GRUS/Ramsay (to be pursued in Nevada at its own cost and limiting its award to 50% of any recovery)—subject in both cases to the willingness of the parties to receive such assets (collectively, the "Assigned Claims"); (c) all of GRB's intellectual property and other intangible assets to Ramsay, provided that such assignment shall have no effect on the Assigned Claims or any damages awarded therefrom;[7] and (d) all liability for any claims asserted now or in the future against GRB to Seibel and Ramsay equally. After such

---

[6] The Nevada Actions are consolidated proceedings pending in Nevada state court where Seibel is prosecuting derivative claims on behalf of GRB against, among others, Caesars and Ramsay, and Caesars is prosecuting clams against Seibel.

[7] "Specifically, the Receiver recommends that an IP transfer agreement be executed between GRB and Ramsay upon approval of the Receiver's Recommendation, and that such agreement preclude Ramsay from using this assignment as a defense to any of the Assigned Claims or as a limitation on GRB's damages. This assignment nevertheless recognizes Ramsay's legitimate business interests in 'sell[ing] one of the most popular and beloved food preparations in all of history,' and in IP based on his name/likeness that allows him to 'capitalize on the celebrity and status Ramsay has spent his career building.'" *In re GR BURGR, LLC*, 2017 WL 3669511, at *11 (Del. Ch. Aug. 25, 2017). It also recognizes that, for the same reasons, the IP has little or no value to Seibel other than as a possible means of extracting further consideration from Ramsay." Report at 2, n.2.

assignments, GRB should be canceled and this action should be dismissed with prejudice after Seibel re-files his Delaware claims in Nevada.

As relates to the proposed Liquidation Plan's treatment of GRB's litigation assets, GRUS objects to the Receiver's recommendation because it allows Seibel to continue to prosecute baseless claims in the Nevada Actions as a means to extract additional consideration from GRUS (and ultimately Ramsay). In response to this and other concerns, I asked the parties and the Receiver to provide supplemental submissions regarding the feasibility (and legality) of putting GRB's potential derivative claims up for auction, open to Members, as a means to realize maximum actual value while minimizing "hold up" value with respect to these claims. After considering the submissions, I am satisfied the auction approach is neither feasible nor appropriate. Accordingly, I adopt the Receiver's recommended approach to addressing the GRB litigation assets.

In evaluating the merits of the purported derivative claims brought by Seibel on behalf of GRB, the Receiver carefully analyzed each claim and ultimately divided them into "The Claims Worth Pursuing" and "The Claims Not Worth Pursuing." I agree with the Receiver's thoughtful assessment of these claims. With this

assessment in mind, my initial inclination was to direct that the Receiver, acting on behalf of GRB, cause "The Claims Not Worth Pursuing" to be dismissed. This would reduce the risk that Seibel will use non-meritorious claims as leverage to extract value from GRUS. Ultimately, however, I am satisfied this approach does not work since GRUS also purports to have derivative claims it wishes to assert on behalf of GRB against Seibel. Under the Plan of Liquidation, there would be no independent vetting of those claims like the vetting the Receiver has undertaken with respect to Seibel's purported derivative claims. Thus, there would be no means for the Receiver to prevent GRUS from pursuing derivative claims against Seibel that are not, in fact or law, "worth pursuing." Under these circumstances, in my view, the better approach is to assign *all* of GRB's litigation assets to the Members, in line with their respective interests in pursuing them, and then allow the Nevada courts to separate the wheat from the chaff.

As for the balance of the Receiver's recommendation, having reviewed the Report carefully, and "[b]elieving the [Receiver] to have dealt with the issues in a proper manner," I see no basis to repeat his analyses or depart from his

recommendations.[8]  The Receiver shall work with the parties to prepare and submit

an appropriate form of implementing order and the agreement(s) necessary to

implement the Plan of Liquidation provided for therein.

Very truly yours,

*/s/ Joseph R. Slights III*

JRSIII/cap
cc:     Kurt M. Heyman, Esquire
        Register in Chancery

---

[8] *In re Erdman*, 2011 WL 2191680, at *1 (Del. Ch. May 26, 2011).